THE TRUSTEES OF THE THEOLOGICAL SEMINARY OF AUBURN, and others, *appellants, vs.* MINERVA CALHOUN, *respondent.*

One of the subscribing witnesses to a will testified that she saw the testator sign his name, at the end of the paper; that he then said "we want you to sign this;" that she did sign her name to a paper, in his presence; but did not hear him say that it was his last will and testament; that she heard the other subscribing witness say, in the testator's presence, at the time the latter signed the instrument, that it was the testator's last will and testament; but that there was no word or sign of assent by the testator; and that he was deaf, and in her opinion did not hear all that was said. *Held* that this was not sufficient evidence of a due *publication,* to authorize the surrogate to admit the will to probate. BACON, J. dissented.

Notwithstanding the failure of one witness to remember that all the statute formalities were complied with, if they are proved by the other to have been observed, the will will be admitted to probate.

But before this principle can apply, the surrogate must be satisfied that the witness testifying to a compliance with the requisite forms is truthful — that he is telling the transaction precisely as it occurred. If one witness undertakes to swear to matters which the other swears never occurred, it is for the surrogate to say which he will believe.

THIS is an appeal from a decision of the surrogate of the county of Cayuga, rejecting the paper propounded as the last will and testament of Peter Douglass, deceased, and deciding that the same was void, on the sole ground that it was *not duly published* by the testator. The deceased was a very aged man, about 85, and quite hard of hearing, and quite feeble; but had at all times superintended all his business. He had a large farm of over 400 acres, and a good deal of personal property. The respondent was his only child, and she was a widow with five children, and lived with the deceased. The will gives her and her children all his real estate; and gives, besides, to each of them legacies, and life annuities to be paid from the income of his personal property. The residue of the personal estate, after the payment of legacies, and setting apart a fund sufficient to meet the life annuities, is given to the appellants, the Trustees of the Theological Seminary of Auburn, and the Trustees of the Presbyterian House of the city of Philadelphia, for charitable purposes, specified by the testator in instructions given by him to the appellants, but not specified in the will. It also gives to the appellants the fund given to provide for the annuities, whenever the same shall become released from time to time by the death of the annuitants. There were but two persons present at the execution, Frederick Starr, jun. and Mary Fitzgibbon, a domestic in the family; the latter was in the room but a few minutes to witness it. The probate of this will was resisted by Mrs. Calhoun, the heir at law, on the grounds of the feebleness of the testator, and his inability to resist the influences brought to bear upon him; and

also for a lack of due publication of the will. The following facts were proved, before the surrogate:

The testator sent for Starr, one of the witnesses, to draw a new will. The only alterations from a former will he desired to be made, or that were made, related to his charitable bequests. Starr spent the day with him in preparing the will. The devises, legacies and annuities to his daughter, Mrs. Calhoun, and her children, were copied literally from the former will. After the will was prepared, he desired that Starr, and Mary, his servant girl, should be the witnesses, and said to Mrs. Calhoun, "call Mary to witness this will." When she came in, Starr testifies that Mr. Douglass said to her, "I want you to witness this instrument, or paper, one or the other word," * * "it is my will." But Mary testifies that when she came in she "sat down in the chair by the stand, and Mr. Douglass said, 'we want you to sign this.' That was all I can remember. Mr. Douglass did not call it his will. Mr. Starr did say it was Mr. Douglass' will." This last declaration is repeated several times. She says, "I heard Mr. Starr say at the time Mr. Douglass signed the instrument, that it was Mr. Douglass' last will and testament. He referred me to the margin with red ink notes, and then turned over the pages and said it was Mr. Douglass' last will and testament. Then Mr. Douglass signed it. There was a separate paper concerning Sarah. Mr. Starr said, 'sign that.' Mr. Douglass said, 'I will sign in both places.'" She also testified — "I can't say as Mr. Starr read the attestation clause to me or not." "I think Mr. Starr took up the instrument and read something to me before I signed it. I can't say what it was." Again she testified — "I did not know the paper I signed was a will, from any thing Mr. Douglass said. All Mr. Douglass said to me was, 'we want you to sign this.' I can't say as Mr. Douglass said any thing about the seal, to me. Mr. Douglass was hard of hearing — very hard. When Mr. Starr spoke to me about signing the will, and that it

Trustees of the Theological Seminary of Auburn *v.* Calhoun.

was Mr. Douglass' last will, don't think Mr. Douglass heard all of it, judging from my experience with him."

*John Porter*, for the appellants.

*Cox & Avery*, for the respondent.

MULLIN, J. To authorize a surrogate to admit a last will to probate, it must be executed and attested in the following manner: 1. Subscribed by the testator at the end of the will. 2. Such subscription shall be made in the presence of each of the attesting witnesses, or shall be acknowledged to have been so made to each of the witnesses. 3. When the testator subscribes the will, or makes the acknowledgment, he shall declare the instrument so subscribed, to be his last will and testament. 4. There shall be two witnesses, who shall sign at the end of the will, at the request of the testator. (3 *R. S. 5th ed.* 144, § 35.)

In *Coffin* v. *Coffin*, (23 *N. Y. Rep.* 15,) it is said that the declaration that the instrument is the last will and testament need not be in any particular form; any communication of the testator, whereby he makes known to them that he intends the instrument to take effect as his will, will satisfy the requirement. In that case both witnesses were present, and one of them asked the testator if he wished him to sign or witness the will; and the testator answered in the affirmative. This was held a good publication, by the judge delivering the opinion. There can be no doubt that such a declaration can be made in answer to a question, or even by a sign. It is only required that it be understandingly made.

In *Lewis* v. *Lewis*, (1 *Kern.* 226,) Allen, J. says: "To satisfy the statute, the testator must in some manner communicate to the attesting witnesses, at the time they are called to sign as witnesses, the information that the instrument then present is of a testamentary character, and that he then recognizes it as his last will and testament, by some assertion, or some clear assent in words or signs; and the declara-

tion must be unequivocal. The policy and object of the statute require this; and nothing short of this will prevent the mischief and fraud which were designed to be reached by it. It will not suffice that the witnesses have elsewhere, and from other sources, learned that the document which they are called to attest is a will; or that they suspect or infer from the circumstances and occasion that such is the character of the paper. The fact must in some manner, although no particular form of words is required, be declared by the testator in their presence; that they may not only know the fact, but that they may know it from him, and that he understands it, and at the time of its execution, which includes publication, designs to give effect to it as his will. And to this, among other things, they are required by statute to attest."

Keeping in mind this construction of the clauses in question, let us proceed to examine the evidence given before the surrogate, in order to see whether it comes up to the standard established by the courts. Mary Fitzgibbon was one of the witnesses, and subscribed her name at the end of the will, as required by the statute. The certificate signed by her is in the usual form; but it is not of itself evidence to prove the due execution of the will. She was therefore called before the surrogate, and her examination under oath reduced to writing; and in that examination she testifies that she saw the deceased sign his name at the end of the paper. He said he wanted her to sign her name to a paper. She did so. Did not hear him say that it was his last will and testament. She signed it in his presence.

It cannot be seriously claimed that upon the evidence thus given, the statute has been complied with. On the contrary, the most important requirements are entirely disregarded. If we go to her oral evidence, taken on a more full and direct cross-examination by counsel, the case is not changed. She says: "I heard Starr say at the time Mr. Douglass signed the instrument, that it was Mr. Douglass' last will and tes-

tament. He referred me to the margin with red ink notes, and then turned over the pages and said it was Mr. Douglass' last will and testament. Then Douglass signed it. There was a separate paper concerning Sarah. Starr said, 'sign that.' Douglass said, 'I will sign in both places.' Think he signed the one concerning Sarah first; then he signed the other opposite the seal. I sat down in the chair by the stand, and Douglass said, 'we want you to sign this.' Mr. Douglass did not call it his will. Starr said it was Douglass' will. Douglass did not say to me, I want you to witness this instrument. He did not tell me what it was. Douglass signed it, and then put his finger on the seal." On her cross-examination she says she supposed it was a will, because Starr told her so, and because Huggins had been there a few days before, making a will. All Douglass said was, "we want you to sign this." Douglass was very hard of hearing. She also testified that she had been in Douglass' employ for some time, and she did not think, judging from her experience with him, that Douglass heard all Starr said when he spoke to her about signing the will, and that it was Douglass' last will. She testifies to other matters, but the foregoing is the substance of the evidence on the subject of the execution of this will; and I repeat, it falls very far short of establishing a legal execution of it. Not one word is spoken by Douglass, except to say that he wanted her to sign this; and she thinks it probable he may have said, pointing to the will, that it was his. Starr said it was Douglass' will, in his presence, but there was no word or sign of assent, or any indication that he understood what was said. This would be enough to prevent probate; but superadded to this is the evidence of great deafness, and of the opinion of the witness, founded on her acquaintance with him, that he did not hear what Starr said.

But notwithstanding the failure of one witness to remember that all the statute formalities were complied with, if they are proved to have been complied with, by the other,

the will will be admitted to probate. (*Nelson* v. *McGiffert,* 3 *Barb. Ch. Rep.* 158.)

Starr, the other witness, testifies with the greatest minuteness to the doing of all the statute requires to be done in order to constitute a valid execution and publication of a will, and within the case of *Nelson* v. *McGiffert* due publication was established. But before the principle can apply, the surrogate must be satisfied that the witness is truthful— that he is telling the transaction precisely as it occurred. If one witness undertakes to swear to the matters which the other witness swears never occurred, it is for the surrogate to say which he will believe. The difficulty in this case is not that the witness Mary Fitzgibbon has forgotten what occurred; but it is that she recollects that the essential things required by the statute were not said or done.

I think the surrogate was right in holding that he could not, on Starr's evidence, admit the will to probate. He was personally interested in the fund willed to the corporations; and he had most unfairly withheld all information on that subject, when he could not have forgotten that he was entitled to demand five per cent on the money given through his agency, to the corporations of which he was agent. Add to this his own statement of his intercourse with the testator, the influence brought to bear upon him to obtain money for these corporations, his bodily infirmities, his great age, the opportunity afforded to practice on his religious or benevolent feelings, the manner in which, and the steps by which, a gift and bequest obviously greatly beyond what the testator originally intended to give to such purposes were obtained; all conspire to convince me that this will ought not to be admitted to probate on the evidence furnished to the surrogate.

It is quite clear that the surrogate means to rest his decision on his want of confidence in the evidence of Starr, and his belief that the witness Mary has honestly stated what transpired on the occasion of the execution of the will.

On this ground I think he was right, and that his decree should be affirmed with costs.

MORGAN, J. concurred.

BACON, J. (dissenting.) Nothing can well be clearer than that the will of Peter Douglass, concerning which this controversy has arisen, expressed the deliberate mind and purpose of the testator. He had no intention of dying intestate, and he had for some time cherished the design of making large benefactions to what he considered benevolent and religious objects. He caused to be prepared and had executed two wills before the one in question, and in respect to the will which immediately preceded the one which was offered for probate, the same general plan and purpose was manifested, and it is important to remark that the provisions made for his family, and the relatives to whom he made specific bequests, were precisely the same with those in the will now before us. No question, moreover, is now made in regard to the competency of the testator to make a will, although the opposition to the probate started upon that theory, and was apparently maintained to the close of the hearing before the surrogate. It is conceded that the testator was a man of clear intellect, good business capacity and sound judgment; or in the emphatic words of Mr. Cox, the counsel for the contestants, when called as a witness before the surrogate, "He was a man of uncommon method, regularity, deliberation, prudence and exactness." In short, there was, and there can be, no reason to doubt his capacity to make a will.

On the occasion when this will was signed by him, it is equally clear, if the slightest credence is to be given to the testimony of Mr. Starr, the testator sought industriously to comply with all the forms which the law has prescribed as necessary to the due execution of a will. He was not a stranger to those requisitions, for he had already executed two wills and five codicils, between the years 1856 and 1859,

and the will immediately preceding the one in question only a few days before. A man of his intelligence, exactness and persistency would not be very likely to omit any formality which he had been taught was necessary to give effect to what he intended to be his matured will, the well considered purpose of his mind, and the crowning act of his life.

The controversy then is narrowed down to a single inquiry. The surrogate refused to admit the will to probate on the sole and specific ground that "it was not duly published as the last will and testament of the deceased," and that is the only point before us on this appeal. The provisions of the statute in regard to the execution of wills are very familiar, and consist of four things, to wit: Subscription by the testator, making or acknowledgment of the same before witnesses, publication of the instrument as a will, and signature by the witnesses. The language of the 3d subdivision requires " a declaration by the testator, at the time of making or acknowledging the subscription, that the instrument so subscribed is his last will and testament."

At the time of the execution of the will of Peter Douglass, the only persons present and in the room were the two attesting witnesses, Frederick Starr and Mary Fitzgibbon. The former was the agent of the Western Education Society and the Auburn Theological Seminary. He had had previous consultations and protracted discussions with the testator in regard to the provisions he intended to make of a charitable nature, and had drawn up the will in question, copying many of its provisions literally from the previous will, and obviously knew all that was necessary to be done to complete the execution. The latter was a servant in the family, sent for by the testator for the express purpose of witnessing the will. The testimony of Starr is clear and explicit that there was a full compliance with all the requirements of the statute in relation to the execution of wills.

The surrogate, in the elaborate opinion with which we have been furnished, concedes this, and adds, that " so great

particularity and completeness in the publication of a will had rarely, if ever, come under his observation." Upon this minuteness and particularity, however, coupled with what the surrogate considered the somewhat questionable position in which he stood in reference to the benefactions of this will, the surrogate founds a criticism somewhat unfavorable to the candor and disinterestedness of this witness. The fact appeared that the compensation of Mr. Starr depended to a considerable extent, if not entirely, upon his success in bringing funds into the treasury of the seminary, and he was paid by a per centage upon the amounts ultimately received from gifts and bequests to the institution. It gave him a pecuniary interest in the results, and, judging from the ordinary operations of the human mind, would make him solicitous not only to procure such bequests, but intent and keen to secure their realization. The arrangement was undoubtedly highly objectionable, and is only another illustration of the manner in which good men, in pursuit of what they deem to be, and doubtless are, worthy objects, sometimes seek to compass them by means and agencies which men of mere worldly experience and sagacity instinctively condemn. It is, to say the least, an unfortunate and ill judged arrangement, and the sooner it is abandoned the better for the fair fame of the institution, and the protection of the agent from what are not unnatural, but doubtless are very uncharitable surmises.

But it is obvious to remark that these considerations to which the surrogate refers, would very strongly tend to arouse the attention and quicken the diligence of the witness, and thus make it probable that his narration of the facts attending the execution of the will, provided all confidence in his integrity was not lost, would be far more reliable than that of a witness hastily summoned to perform a novel office, and whose testimony is in many points uncertain and indistinct, and in all its aspects much less distinguished than that of Mr. Starr by intelligence, and the faculty of clearly observing and fully recalling the incidents that marked the occasion,

Unless the surrogate wholly discredited the testimony of Starr, it seems to me impossible to sustain his conclusion that there was no publication of the will. That he did not thus discredit him is clear from his own declaration, where, in speaking of the manner of his testifying, he says, "without reflecting upon his credibility, I am impelled to the conclusion that the judicial mind cannot rest with such *entire confidence* upon his testimony as to discredit that of the other subscribing witness." There is nothing in the matter of Starr's testimony that should discredit him; and if, as we may infer from the language of the surrogate, there was nothing in his manner of testifying that awakened his suspicions, I see not why his testimony is not entitled to full belief. If so, there is an end to the question; because it is quite clear that the non-recollection of one witness will not defeat the proof of a will, if the other is competent to, and does in fact, supply the necessary evidence.

In this connection I cannot refrain from quoting the language of Judge Comstock in *Coffin* v. *Coffin*, (23 *N. Y. Rep.* 14,) as strikingly applicable to the condition of these two witnesses: "As the case appears to us," he says, "without their actual presence, we should certainly think the evidence of Mr. C. to be altogether the most reliable. That he had much greater intelligence in regard to a subject of this nature, cannot be doubted. Indeed, we have every reason to conclude that he had, before preparing this will, made himself fully acquainted with the formalities which the law required. From his situation and relation to the transaction, his attention must have been given to all the particulars, and his evidence is direct and positive. On the other hand, the subscribing witnesses were called into the presence of the testator for the purpose of attestation only, and their failure to state all the facts to which the other witness deposed, may not unreasonably be referred to their want of attention or of memory."

There is no reason whatever, from any thing that appears

in this case, to discredit the testimony of Mary Fitzgibbon on the score of want of integrity; failure of memory, or want of sufficient attention, or a moderate degree of intellect, might readily account for the fact that she does not recall words and incidents which the other witness states with great distinctness and with unquestioned intelligence. The surrogate chooses to put his decision, not on the ground that he entirely discredited Starr, but that as the testimony of the two witnesses directly contradicted each other as to the fact of publication, he preferred to rely on the recollection, or rather want of recollection, of the girl. I confess this seems to me a very unsafe reliance, and, as I have said, the conclusion is one hardly to be warranted, except by setting aside the testimony of Starr as wholly unworthy of belief. But I think it by no means clear that the testimony of the two witnesses is so varient as to justify the conclusion that they directly contradict each other on the point of publication, and in collating the two, it seems to me the surrogate hardly does justice to either.

The testimony of Mary leaves us in doubt whether Starr did not read the attestation clause. She says in one part of her testimony, "I can't say as Starr read the attestation clause to me, or not;" and subsequently she adds: "I think Starr took up the instrument, and read something to me before I signed it; I can't say what it was." Now if Starr did read something to her, before she signed her name, it was beyond doubt the attestation clause; and if he did, and it was heard by Douglass, this would be, within the case of *Brinkerhoff* v. *Remsen,* (8 *Paige,* 499,) a perfectly good publication. It is not necessary to spend time upon the authorities which declare what shall be a sufficient publication of a will within the statute. It is sufficient to state, as a concise summary of the whole, that the provision in regard to publication is satisfied if the proof shows that the testator knew the nature of the instrument he executed, and that the witnesses were informed at the time that it was his will, either

by himself, or by any one acting for him, and in his presence See *Brinckerhoof* v. *Remsen*, (8 *Paige*, 488 ; *S. C.*, 26 *Wend.* 325 ;) *Seguine* v. *Seguine*, (2 *Barb.* 385 ;) *Torry* v. *Bowen*, (15 *id.* 304 ;) *Nipper* v. *Groesbeck*, (22 *id.* 670 ;) and the very recent case in the court of appeals of *Coffin* v. *Coffin*, (23 *N. Y. Rep.* 9,) in which case Comstock, J. says that " any communication of the testator to the witnesses, whereby he makes known to them that he intends the instrument to take effect as his will, will satisfy the statute." The important and the only important thing to be established is, that the testator understands, and the witnesses know, that the instrument signed and attested, is executed as a will. That the testator in this case knew what the instrument was, and intended to perform every act which the law requires to make a perfect execution, is beyond controversy ; and I think it will not be questioned that Mary Fitzgibbon knew well enough the nature of the instrument, although this fact was not brought to her remembrance, and may not in fact have been communicated to her by the testator. In her testimony she says distinctly, "I heard Mr. Starr say at the time Mr. Douglass signed the instrument, that it was Mr. Douglass' last will and testament. He referred me to the margin, and then turned over the pages and said it was Mr. Douglass' last will and testament, and then Mr. Douglass signed it." The request the testator made to her, after signing his name, was, as she states it, " I want you to sign this ;" and she signed it, as she says, " right before Mr. Douglass."

It is true she says she did not know the paper was a will from any thing Mr. Douglass said ; but in the same connection in which she speaks of the declaration of Starr that it was the last will of Douglass, she gives testimony which, coupled with a statement of Starr in reference to the same transaction, established the fact of publication beyond reasonable cavil. The law is well settled that the requirement of the statute on this subject is satisfied, if it appears from the testimony that the subscribing witnesses knew at the time

they subscribed the instrument, from communications made to them by the testator, or other persons *in his presence and acting in the matter for him,* that the instrument was the testator's last will and testament, and was executed as such. (*Torry* v. *Bowen,* 15 *Barb.* 305.) Now the testimony here is unequivocally that Starr declared the instrument to be the last will and testament of Mr. Douglass, in his presence, and while all were engaged in the execution, and this declaration the other witness distinctly heard and clearly understood. But the question is made, whether this declaration was heard by the testator. I have not forgotten the fact that the testator was very deaf, and under ordinary circumstances it might be urged with considerable force, as it has been here, that from this infirmity it is very doubtful whether all this did not pass in dumb show before his eyes, and that as he gave no outward and visible sign, but remained silent and inactive, it is to be inferred that he did not hear, and so did not assent to the statement. I am not prepared to say that this inference should of itself be sufficient to establish the want of publication of the will; but there is some affirmative evidence on this very point, that seems to me to overcome that inference, and conduct the judicial mind to a fair conclusion that the declaration of Starr was heard, and assented to, and thus publication made of the will.

We have seen that the declaration was made, by the concurring testimony of both witnesses. It was in the immediate presence of the testator, and directly under his eye. Starr says that when he spoke to Mary and told her it was Mr. Douglass' will, he spoke loud enough " so that Mr. Douglass heard it;" and his position he says was at the time within two feet of the testator, and within a foot of his ear. It may be conceded, although the testimony is in the form of a positive assertion, that this is only matter of opinion. On a question of this nature, this is the most we can ever have, unless a response is given which establishes the fact. The testimony of Mary on this point is as follows : "When Mr.

Starr spoke to me about signing the will, and that it was Mr. Douglass' last will, I don't think Mr. Douglass *heard all of it,* judging from my experience with him." The surrogate, in alluding to this testimony of the witness, by a singular inadvertence quotes her as saying, " I don't think Mr. Douglass heard what Mr. Starr said to me." This is not her language. She does not think, she says, the testator heard " all of it." Now who shall say what part he did or did not hear ? Was it the part in which the witness was requested to sign, or the portion which contained the declaration that it was the will of Douglass, or was it parts of both ? If he heard the statement that it was his will, it was enough to satisfy the statute in regard to publication, and he himself requested her to sign the paper. If presumptions are to be indulged, they should be such as will uphold a will so carefully considered, so deliberately matured, as this appears to have been, and not to overthrow, annul and defeat the manifest purpose and intent of the testator.

From all the examination I have been able to give this case, it is my deliberate conviction that the will of Peter Douglass was in all respects well executed, and the decree of the surrogate should accordingly be reversed, and the proceedings remitted to him with directions to admit the same to probate.

Decree affirmed.

Oswego General Term, July 8, 1862. *Mullin, Morgan* and *Bacon,* Justices.]